## FT. SMITH & W. R. CO. v. BLEVINS.

### No. 2867.   Opinion Filed January 28, 1913.

#### (130 Pac. 525.)

1.   **REMOVAL OF CAUSES**—Increase or Ad Damnum.   Where plaintiff amends his petition, increasing the amount sued for so as to constitute a removable cause to the proper federal court, the right to remove is thereby given, and, if the defendant by proper application in due time avails itself of that right, it cannot be denied.

(a)   Where the defendant, resident of another state, regularly and strictly in accordance with Act Cong. Sept. 24, 1789, c. 20, 1 St. at L. 73, known as the "Judiciary Act," as amended by Act March 3, 1887, c. 373, 24 St. at L. 552, and by Act. Aug. 13, 1888, c. 866, 25 St. at L. 433 (U. S. Comp. St. 1901, p. 508), files his petition in the state court for the removal of the cause to

the United States Circuit Court, and a sufficient bond, which is offered for the approval of the state court, the said court is ipso facto ousted of jurisdiction; and whether an order for removal is granted or denied by the state court, all further proceedings therein are coram non judice and void.

2.    REMOVAL OF CAUSES—Actions Under Employer's Liability Act. Act April 5, 1910, c. 143, 36 St. at L. 291 (U. S. Comp. St. Supp. 1911, p. 1324), amending section 6 of the Employer's Liability Act (Act April 22, 1908, c. 149, 35 St. at L. 66 [U. S. Comp. St. Supp. 1909, p. 1173]), so as to provide that the jurisdiction of the courts of the United States under said act shall be concurrent with that of the courts of the several states, and no case arising thereunder and brought in any state court of competent jurisdiction shall be removed to any court of the United States, has no application to actions brought prior to the amendment.

(Syllabus by the Court.)

*Error from District Court, Okfuskee County; John Caruthers, Judge.*

Action by Robert L. Blevins against the Ft. Smith & Western Railroad Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

*C. E. & H. P. Warner,* for plaintiff in error.

*Winston T. Banks,* for defendant in error.

WILLIAMS, J. This proceeding in error seeks to review the judgment of the trial court wherein the defendant in error, as plaintiff, sued the plaintiff in error, as defendant, to recover for personal injuries. By petition filed January 19, 1909, plaintiff alleged injuries to have been sustained by him on May 21, 1909, as a result of the negligence of the defendant in the sum of $1,999.90 whilst in the employ of the said defendant, on a work train, assisting in ditching the sides of its track and removing the dirt to fills, and doing such other things connected with the work as he was directed by the defendant's foreman in charge. At the first trial on May 10, 1910, a verdict was rendered for plaintiff in the sum of $300. Plaintiff moved for a new trial. This motion being concurred in by the defendant the same was granted; the plaintiff being given twenty days to file an amended petition. On May 26, 1910, plaintiff filed such amended petition to recover in the sum of $1,999.90. On February 15,

1911, the case was called for trial, and plaintiff, upon application, was given leave to amend his petition by changing the general allegation to read that the plaintiff had been damaged in the sum of $12,250 instead of $1,999.90, and changed the prayer in said petition and asked for the recovery of $12,000 damages and $250 expenses and medical aid, making a total of $12,250, instead of $1,999.90, to which defendant excepted. Thereupon defendant was given until 1:30 p. m. o'clock to plead to the amended pleading. On the same day the defendant asked leave to file application to remove the cause to the federal court, and same was in due form with the required bond.

Where the plaintiff amends his petition increasing the amount or *ad damnum,* so as to constitute a removable cause, the right to remove is thereby given, and, if the defendant by proper application in due time avails itself of that right, it cannot be denied. *Huskins v. Cincinnati, N. O. & T. P. Ry. Co.,* 37 Fed. 504, 3 L. R. A. 545; *Cookerly v. Great Northern Ry. Co.* (C. C.) 70 Fed. 277; *Speckart v. German National Bank et al.* (C. C.) 85 Fed. 12; *Bailey v. Mosher et al.* (C. C.) 95 Fed. 223. In *Powers v. Chesapeake & Ohio Ry. Co.,* 169 U. S. 100, 18 Sup. Ct. 264, 42 L. Ed. 676, it was held that under Act Cong. March 3, 1887, c. 373, 24 St. at L. 552, amending Act Cong. 1789, c. 20, 1 St. at L. 73, known as the "Judiciary Act," as corrected by act Aug. 13, 1888, c. 866, 25 St. at L. 433 (U. S. Comp. St. 1901, p. 508), the right to remove could be exercised as soon as the pleadings on behalf of plaintiff were so amended as to show a removable cause, although as originally begun the action was not removable because the necessary diversity of citizenship or amount in controversy did not appear.

In *Stevens et al. v. Phoenix Ins. Co.,* 41 N. Y. 149, it is held:

"Where the defendant, citizen of another state, regularly, and strictly in accordance with act of Congress of 1789, known as the 'Judiciary Act,' files his petition in the state court for the removal of the cause to the United States Circuit Court, and a sufficient bond, which is offered for the approval of the state court, the state court is *ipso facto* ousted of jurisdiction; and, whether an order for removal is granted or denied by the state

court, all further proceedings therein are *coram non judice* and void."

See, also, *C., R. I. & P. Ry. Co. v. Brazzell,* 33 Okla. 122, 124 Pac. 40; *Western Coal & Mining Co. et al. v. Osborne,* 30 Okla. 235, 119 Pac. 973; *Bolen-Darnell Coal Co. v. Kirk,* 25 Okla. 273, 106 Pac. 813, 26 L. R. A. (N. S.) 270; *Choctaw, O. & G. R. Co. v. Burgess,* 21 Okla. 110, 95 Pac. 606.

The foregoing proposition does not appear to be controverted by counsel on either side; both sides joining in stating that the trial court denied same on the theory that Act Cong. April 5, 1910, c. 143, 36 St. at L. 291 (U. S. Comp. St. Supp. 1911, p. 1324), passed to amend Employer's Liability Act April 22, 1908, c. 149, 35 St. at L. 65 (U. S. Comp. St. Supp. 1909, p. 1173; U. S. Comp. St. Supp. 1911, p. 1322), deprived defendant of such right of removal.

This identical question is passed on in *Newell v. Baltimore & O. R. Co.* (C. C.) 181 Fed. 698, wherein it is. said:

"In addition, the amendment of 1910 does not confer jurisdiction upon pending suits. The use of the words, 'may be brought,' clearly indicates that it refers to actions to be commenced after its passage. In addition, also, it is a general proposition of law that statutes will not be given a retroactive effect or apply to pending cases, unless they relate to procedure merely, or are so expressed in the act. As said by Mr. Justice Clifford in *Twenty Per Cent. Cases,* 20 Wall. 187, 22 L. Ed. 339: 'Even though the words of a statute are broad enough in their literal extent to comprehend existing cases, they must yet be construed as applicable only to cases that may hereafter arise, unless the language employed expresses a contrary intention in unequivocal terms.' I am of the opinion that the amendment of 1910 was not retroactive, and did not confer jurisdiction upon this court over the defendant. Had plaintiff elected to proceed without amendment of his statement or declaration, the benefits which he hoped to have by reason of the employer's liability act, which are unnecessary to be stated, might have been lost to him. He insisted upon the amendment, and as well asserts that the original statement sets forth a cause of action under the statute. The jurisdiction sought was not founded only upon diverse citizenship. * * *"

An act of the Indiana Legislature of 1853 (Acts of 1853, p. 113) authorized suits to be brought before a justice of the peace

only, and hence the recovery was limited to $100; but by the amendatory act (Acts 1859, p. 105), where the damages exceed $50, the party may bring this suit in the circuit or common pleas court, and recover the value of the animal killed or injury inflicted. In the opinion it is said (*Indianapolis & Cincinnati R. Co. v. Kercheval*, 16 Ind. 88):

"The language of the amendment, so far as it indicates any legislative intent in respect to the question now under consideration, is as follows: 'That whenever any animal or animals shall be killed or injured by the cars or locomotives, or other carriages, used on any railroad in this state, the owner thereof may go before some justice of the peace,' etc. The language here employed seems to be clear and explicit. The amendment applies only to such animals as 'shall be' killed. 'Shall be' clearly indicates the future, and not the past. There is nothing in the amendment which indicates, so far as we can discover, an intent on the part of the Legislature to make it restrospective, and embrace animals previously killed. This court has in two instances at least indicated the rule of construction in this respect. Thus: 'It is a well-settled principle of law that the courts are to give statutes a prospective operation, where there is nothing indicating a different intention on the part of the Legislature which enacted the statutes.' *Pritchard v. Spencer*, 2 Ind. 486. Again: 'Statutes are to be considered prospective, unless the intention to give a restrospective operation is clearly expressed; and not even then, if, by such construction, the act would divest vested rights.' *Aurora, etc.; Turnpike Co. v. Holthouse*, 7 Ind. 60."

See, also, *Wright v. Southern Ry. Co. et al.* (C. C.) 80 Fed. 260; *Ranney v. Bostic*, 15 Mo. 216; *Murray v. Gibson*, 15 How. 421, 14 L. Ed. 755; *N. Y. & O. M. R. Co. v. Van Horn*, 57 N. Y. 477; *McEwen et al. v. Dem et al.*, 24 How. 242, 16 L. Ed. 672; *Rolater v. Strain*, 31 Okla. 58, 119 Pac. 992; *Good et al. v. Keel et al.*, 29 Okla. 325, 116 Pac. 777.

The cases of *MaHarry v. Eatman*, 29 Okla. 46, 116 Pac. 935, and *Harris v. Gale* (C. C.) 188 Fed. 712, do not militate against the rule announced by the foregoing cases. This court, as well as the United States Court for the Eastern District of this state, reached the conclusion therein expressed not only from the language and the context of the entire act, its subject-matter,

purpose, application, etc., but also from its prior contemporaneous construction by the Interior Department. The proviso of section 6 of the act of May 27, 1908, passed on in said cases by this court and the federal court for the Eastern district of this state, was solely remedial. Such statutes, as a rule, receive a liberal and expansive application at the hands of courts to correct innocent mistakes, cure irregularities in proceedings or give effect to the acts according to the intent thereof. That rule was applied. in *MaHarry v. Eatman, supra,* and *Harris v. Gale, supra.*

Does the petition state a cause of action under the terms of the Employer's Federal Liability Act (Act Cong. April 22, 1908), entitled: "An act relating to the liability of common carriers by railroad to their employees in certain cases" (chapter 149, 35 St. at L. 65 [U. S. Comp. St. Supp. 1911, p. 1322])? Said act is as follows:

"Section 1. That every common carrier by railroad while engaging in commerce between any of the several states or territories, or between any of the states and territories, or between the District of Columbia and any of the states and territories, or between the District of Columbia or any of the states or territories and any foreign nation or nations, shall be liable to damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

"Sec. 2. That every common carrier by railroad in the territories, the District of Columbia, the Panama Canal Zone, or other possessions of the United States shall be liable in damages to any person suffering injury while he is employed by such carrier in any of said jurisdictions, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if

none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, road-bed, works, boats, wharves, or other equipment.

"Sec. 3. That in all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this act to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

"Sec. 4. That in any action brought against any common carrier under or by virtue of any of the provisions of this act to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

"Sec. 5. That any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act, shall to that extent be void: Provided, that in any action brought against any such common carrier under or by virtue of any of the provisions of this act, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought.

"Sec. 6. That no action shall be maintained under this act unless commenced within two years from the day the cause of action accrued.

"Sec. 7. That the term 'common carrier' as used in this act shall include the receiver or receivers or other persons or corporations charged with the duty of the management and operation of the business of a common carrier.

"Sec. 8. That nothing in this act shall be held to limit the duty or liability of common carriers or to impair the rights of

their employees under any other act or acts of Congress, or to affect the prosecution of any pending proceeding or right of action under the act of Congress entitled 'An act relating to liability of common carriers in the District of Columbia and territories, and to common carriers engaged in commerce between the states and between the states and foreign nations to their employees,' approved June eleventh, nineteen hundred and six."

Act April 5, 1910, amending the foregoing act (chapter 143, 36 St. at L. 291 [U. S. Comp. St. Supp. 1911, p. 1325]), is as follows:

"That an act entitled 'An act relating to the liability of common carriers by railroad to their employees in certain cases' approved April twenty-second, nineteen hundred and eight, be amended in section six so that said section shall read:

" 'Sec. 6.   That no action shall be maintained under this act unless commenced within two years from the day the cause of action accrued.

" 'Under this act an action may be brought in a circuit court of the United States, in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action. The jurisdiction of the courts of the United States under this act shall be concurrent with that of the courts of the several states, and no case arising under this act and brought in any state court of competent jurisdiction shall be removed to any court of the United States.'

"Sec. 2.   That said act be further amended by adding the following section as section nine of said act:

" 'Sec. 9.   That any right of action given by this act to a person suffering injury shall survive to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee, and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, but in such cases there shall be only one recovery for the same injury.' "

In *Employer's Liability Cases,* 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297, it is said:

"So far as the face of the statute is concerned, the argument is this:   That because the statute says carriers engaged in commerce between the states, etc., therefore the act should be interpreted as being exclusively applicable *to the interstate commerce business, and none other, of such carrier, and that the words 'any employee,' as found in the statute, should be held to*

*mean any employee when such employee is engaged only in inter-
state commerce.* * * * If we could bring ourselves to modi-
fy the statute by writing in the words suggested, that is, by
causing the act to read 'any employee when engaged in interstate
commerce,' we would restrict the act as to the District of Colum-
bia and the territories, and thus destroy it in an important particu-
lar. To write into the act the qualifying words, therefore, would
be but adding to its provisions in order to save it in one aspect,
and thereby to destroy it in another; that is, to destroy in order to
save, and to save in order to destroy."

In *Hyde v. Southern R. Co.,* 31 App. D. C. 466, referring
to the foregoing case, it is said:

"Necessarily all that was actually decided in that case was
that, in so far as the act relates to carriers engaged in business in
the states, it is repugnant to the Constitution, in that it applies
to all employees, whether engaged or not in interstate commerce
at the time of injury, and that it cannot be restricted, by construc-
tion, to employees engaged in interstate commerce alone, in or-
der to save its constitutionality."

In *El Paso & Northeastern Ry. Co. v. Enedina Gutierrez,*
215 U. S. 87, 30 Sup. Ct. 21, 54 L. Ed. 106, referring to the
*Employer's Liability Cases, supra,* it is said:

"In that case this court held that, conceding the power of
Congress to regulate the relations of employer and employee en-
gaged in interstate commerce, the act of June 11, 1906 (34 St.
at L. 232, c. 3073, U. S. Comp. St. Supp. 1907, p. 891), was un-
constitutional, in this: that in its provisions regulating interstate
commerce Congress exceeded its constitutional authority in un-
dertaking to make employers responsible not only to employees
when engaged in interstate commerce, but to any of its employees,
whether engaged in interstate commerce or in commerce wholly
within a state."

In *Mondou v. New York, N. H. & H. R. Co.,* 223 U. S. 1,
32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44, it is said:

"(1) The term 'commerce' comprehends more than the
mere exchange of goods. It embraces commercial intercourse in
all its branches, including transportation of passengers and prop-
erty by common carriers, whether carried on by water or by
land.

"(2) The phrase 'among the several states' marks the dis-
tinction, for the purpose of governmental regulation, between
commerce which concerns two or more states and commerce

which is confined to a single state and does not affect other states, the power to regulate the former being conferred upon Congress and the regulation of the latter remaining with the states severally.

"(3) 'To regulate,' in the sense intended is to foster, protect, control, and restrain, with appropriate regard for the welfare of those who are immediately concerned and of the public at large.

"(4) This power over commerce among the states, so conferred upon Congress is complete in itself, extends incidentally to every instrument and agent by which such commerce is carried on, may be exerted to its utmost extent over every part of such commerce, and is subject to no limitations save such as are prescribed in the Constitution. But, of course, it does not extend to any matter or thing which does not have a real or substantial relation to some part of such commerce.

"(5) Among the instruments and agents to which the power extends are the railroads over which transportation from one state to another is conducted, the engines and cars by which such transportation is effected, and all who are in any wise engaged in such transportation, whether as common carriers or as their employees.

"(6) The duties of common carriers in respect to the safety of their employees, while both are engaged in commerce among the states, and the liability of the former for injuries sustained by the latter, while both are so engaged, have a real or substantial relation to such commerce, and therefore are within the range of this power. * * * 'Interstate commerce—if not always, at any rate when the commerce is transportation—is an act. Congress, of course, can do anything which, in the exercise by itself of a fair discretion, may be deemed appropriate to save the act of interstate commerce from prevention or interruption, or to make that act more secure, more reliable, or more efficient. The act of interstate commerce is done by the labor of men and with the help of things; and these men and things are the agents and instruments of commerce. If the agents or instruments are destroyed while they are doing the act, commerce is stopped; if the agents or instruments are interrupted, commerce is interrupted; if the agents or instruments are not the right kind or quality, commerce in consequence becomes slow or costly or unsafe or otherwise inefficient; and, if the conditions under which the agents or instruments do the work of commerce are wrong or disadvantageous, those bad conditions may and often will prevent or interrupt the act of commerce or make it less ex-

peditious, less reliable, less economical, and less secure. Therefore Congress may legislate about the agents and instruments of interstate commerce, and about the conditions under which those agents and instruments perform the work of interstate commerce, whenever such legislation bears, or in the exercise of a fair legislative discretion can be deemed to bear, upon the reliability or promptness or economy or security or utility of the interstate commerce act.' In view of these settled propositions, it does not admit of doubt that the answer to the first of the questions before stated must be that Congress, in the exertion of its power over interstate commerce, may regulate the relations of common carriers by railroad and their employees, while both are engaged in such commerce, subject always to the limitations prescribed in the Constitution, and to the qualification that the particulars in which those relations are regulated must have a real or substantial connection with the interstate commerce in which the carriers and their employees are engaged."

In *Southern R. Co. v. United States,* 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, it is said:

"The original act of March 2, 1893 (27 St. at L. 531, c. 196 [U. S. Comp. St. 1901, p. 3174]), imposed upon every common carrier 'engaged in interstate commerce by railroad' the duty of equipping all trains, locomotives, and cars used on its line of railroad in moving interstate traffic, with designated appliances calculated to promote the safety of that traffic and of the employees engaged in its movement; and the second section of that act made it unlawful for 'any such common carrier' to haul or permit to be hauled or used on its line of railroad any car 'used in moving interstate traffic' not equipped with automatic couplers capable of being coupled and uncoupled without the necessity of a man going between the ends of the cars. Act March 2, 1903 (32 St. at L. 943, c. 976 [U. S. Comp. St. Supp. 1909, p. 1143]), amended the earlier one and enlarged its scope by declaring, *inter alia,* that its provisions and requirements should 'apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and in the territories and the District of Columbia, and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith. * * *' The real controversy is over the true significance of the words 'on any railroad engaged' in the first clause of the amendatory provision. But for them the true test of the application of that clause to a locomotive, car, or similar vehicle would be, as it was under the original act, the use of the vehicle in moving interstate traffic. On the other hand, when they are given

their natural signification, as presumptively they should be, the scope of the clause is such that the true test of its application is the use of the vehicle on a railroad which is a highway of interstate commerce, and not its use in moving interstate traffic. And so certain is this that we think there would be no contention to the contrary were it not for the presence in the amendatory provision of the third clause—'and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith.' In this there is a suggestion that what precedes does not cover the entire field; but, at most, it is only a suggestion, and gives no warrant for disregarding the plain words, 'on any railroad engaged' in the first clause. True, if they were rejected, the two clauses, in the instance of a train composed of many cars, some moving interstate traffic and others moving intrastate traffic, would by their concurrent operation bring the entire train within the statute. But it is not necessary to reject them to accomplish this result, for the first clause, with those words in it, does even more; that is to say, it embraces every train on a railroad which is a highway of interstate commerce, without regard to the class of traffic which the cars are moving. The two clauses are in no wise antagonistic, but, at most, only redundant; and we perceive no reason for believing that Congress intended that less than full effect should be given to the more comprehensive one, but, on the contrary, good reason for believing otherwise. As between the two opposing views, one rejecting the words 'on any railroad engaged' in the first clause, and the other treating the third clause as redundant, the latter is to be preferred, first, because it is in accord with the manifest purpose, shown throughout the amendatory act, to enlarge the scope of the earlier one and to make it more effective, and, second, because the words which it would be necessary to reject to give effect to the other view were not originally in the amendatory act, but were inserted in it by way of amendment while it was in process of adoption (Cong. Rec. 57th Cong., 1st Sess. vol. 25, pt. 7, p. 7300; *Id.*, 2d Sess. vol. 36, pt. 3, p. 2268), thus making it certain that without them the act would not express the will of Congress. * * * We come, then, to the question whether these acts are within the power of Congress under the commerce clause of the Constitution, considering that they are not confined to vehicles used in moving interstate traffic, but embrace vehicles used in moving intrastate traffic. The answer to this question depends upon another, which is: Is there a real or substantial relation or connection between what is required by these acts in respect of vehicles used in moving intrastate

traffic, and the object which the acts obviously are designed to attain, namely,- the safety of interstate commerce and of those who are employed in its movement? Or, stating it in another way: Is there such a close or direct relation or connection between the two classes of traffic, when moving over the same railroad, as to make it certain that the safety of the interstate traffic and of those who are employed in its movement will be promoted in a real or substantial sense by applying the requirements of these acts to vehicles used in moving the traffic which is intrastate as well as to those used in moving that which is interstate? If the answer to this question, as doubly stated, be in the affirmtive, then the principal question must be answered in the same way. And this is so, not because Congress possesses any power to regulate intrastate commerce as such, but because its power to regulate interstate commerce is plenary, and competently may be exerted to secure the safety of the persons and property transported therein and of those who are employed in such transportation, no matter what may be the source of the dangers which threaten it. That is to say, it is no objection to such an exertion of this power that the dangers intended to be avoided arise, in whole or in part, out of matters connected with intrastate commerce. Speaking only of railroads which are highways of both interstate and intrastate commerce, these things are of common knowledge: Both classes of traffic are at times carried in the same car, and, when this is not the case, the cars in which they are carried are frequently commingled in the same train and in the switching and other movements at terminals. Cars are seldom set apart for exclusive 'use in moving either class of traffic, but generally are used interchangeably in moving both; and the situation is much the same with trainmen, switchmen, and like employees, for they usually, if not necessarily, have to do with both classes of traffic. Besides, the several trains on the same railroad are not independent in point of movement and safety, but are interdependent; for whatever brings delay or disaster to one, or results in disabling one of its operatives, is calculated to impede the progress and imperil the safety of other trains. And so the absence of appropriate safety appliances from any part of any train is a menace not only to that train, but to others. * * * " ·

Employer's Liability Act June 11, 1906 (34 St. at L. 232, c. 3073 [U. S. Comp. St. Supp. 1907, p. 891]), having been held to be violative of the federal Constitution and not authorized by the powers granted to the federal government by the interstate

commerce clause (par. 3, sec. 8, art. 1, Const. of United States) on the ground that it included any employee of every common carrier engaged in interstate commerce, so far as it related to the states, it being assumed in said opinion that, if the act read, "An employee when engaged in interstate commerce," it would be valid, in the light of that opinion the act of April 22, 1908, was passed wherein it is provided that "every common carrier by railroad while engaging in commerce between any of the several states * * * shall be liable in damages to any person suffering injury, while he is employed by such carrier in such commerce, * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

The plaintiff, in his petition, alleged that he was a resident citizen of Okfuskee county, in this state, and that the defendant was a corporation existing under the laws of the state of Arkansas for the purpose of building, equipping, and operating a line of railway from Ft. Smith, Ark., to Guthrie, Okla., said line running through said county. He further alleged:

"That on and before the 21st day of May, A. D. 1909, this plaintiff was in the employ of said defendant company, as one of the employees on a work train of the said defendant company, and that plaintiff's duties were to assist in ditching the sides of the track, and removing the dirt to fills, and doing such other things connected with the work as he was told to do by the defendant's foreman in charge of said work train, and at the time there were eight other men besides plaintiff working with that train; that on May the 21st, A. L. 1909, between the towns of Boley and Castle, in said county and state, this plaintiff and the other work hands on said train were engaged in the same common employment of fixing and repairing the track of the said line of railroad of the said defendant company at said point, and that this plaintiff and said workers were at the said time and place, under the direction and control of one * * * Flecenstine, whose initials are to this plaintiff unknown, who was at that time the conductor of said train, and the foreman of this plaintiff and the other workers on said defendant's work train.

* * * That on the said 21st day of May, 1909, and at said place, and while in the proper exercise and discharge of his duties under such employment, plaintiff and the one who worked with him in handling the tackle block up next to the plow that was used on defendant's cars to unload dirt from said cars were ordered and directed by said foreman to get upon the cars, and move that said tackle block three cars ahead. That, in obedience of said order from said conductor of said train, this plaintiff quit his place in the clear on the ground by side of the car, and mounted the car on which the tackle block was fastened, and stooped to unfasten the chain holding said tackle block to the side of said car, stooping down to unfasten the chain, found the cable caught, and asked the conductor to signal the engineer in charge of the engine to back up and give slack, so plaintiff could unloose the said chain, and that the conductor gave such signal to back up, or he should have given it, and in place of doing that the said conductor either signaled the engineer to go ahead, or the engineer mistook the conductor's signal, and the engineer did jerk the engine ahead, thus jerking the plow to which the cable was attached up near the block where this plaintiff was standing, and brake the defective and rotten chain that was holding the tackle block and cable to said car, and in some way the said tackle block or cable struck this plaintiff on his right leg, breaking it in four places."

In *Newell v. Baltimore & O. R. Co., supra,* it is said:

"The action is brought to recover damages for personal injuries alleged to have resulted from the negligence of the defendant. The suit was brought on March 5, 1910. The statement then filed set forth nothing from which an inference could be drawn that the action was not an ordinary common-law action. This being so, and there being a diversity of citizenship alleged, this court clearly had jurisdiction at the time suit was brought. It is true that in the original statement of the plaintiff's case the words 'interstate traffic' were used, but their use was apparently for the purpose of describing certain cars by which the plaintiff alleged he was injured, and not as descriptive of the employment of the plaintiff. After the general issue had been pleaded, and after the case was upon the trial list, the court permitted the plaintiff to amend his original statement by the addition of the following words: 'Plaintiff avers that on May 6, 1909, and for some time previous thereto, he was employed by the defendant in the capacity of a freight brakeman, and, being so as aforesaid in the service of defendant, he was on said date engaged in the performance of his duties as such in interstate commerce work, and,

while he was as aforesaid engaged, it became necessary in conducting the defendant's business for the crew of which he was a member to place several freight cars used and engaged in interstate traffic on a certain siding or side track of defendant's situate in its railroad yards in the borough of Connellsville, Fayette county, Pa.' It will thus be seen that what had been the common-law action of the plaintiff became by the amendment an action under the act of Congress approved April 22, 1908, commonly called 'Employer's Liability Act,' entitled 'An act relating to the liability of common carriers to their employees in certain cases.'  *  *  *  When the case was reached for trial, and before the jury was selected and sworn, counsel for the defendant moved the court to dismiss the action for want of jurisdiction upon the ground that it appeared from the pleadings that the controversy is one arising under the Constitution and laws of the United States. It was urged by plaintiff's counsel at that time, and at the time of the arugment of this motion, that the suit was brought for the purpose of having the benefit of the federal statutes, that the question of jurisdiction should have been raised at once by the defendant, and, that not having been done, the jurisdiction was waived. To this assent could not be given because the original statement of claim gave no notice of plaintiff's intention to have the benefits of the federal act, and the defendant at the first convenient time after the amendment, which for the first time set out the plaintiff's purpose, raised the question of jurisdiction."

Obviously, under said petition, the plaintiff was not "employed by" defendant "while engaged in commerce between any of the several states," and therefore this action does not come either within the provision of the act of April 22, 1908, or April 5, 1910.

The cause is reversed and remanded, with instructions to allow the application for removal.

All the Justices concur.